

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-07-281-CV

MITCHELL MUSGROVE
AND JULIAN ARD

APPELLANTS

V.

WESTRIDGE STREET
PARTNERS I, LLC

APPELLEE

------------

FROM THE 352ND DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

This is an appeal from a judgment denying appellants Mitchell Musgrove and Julian Ard injunctive relief to enforce restrictive covenants against proposed development by appellee Westridge Street Partners I, LLC (Westridge). In seven issues, appellants contend that the developer failed to establish the affirmative

---

[1] See Tex. R. App. P. 47.4.

defenses of estoppel, abandonment, and changed conditions and that the nonwaiver clause in the covenants precludes application of these defenses. We affirm.

## I. Background

In 1946, the A.C. Luther Company platted Block 52 of the Ridglea Addition to the City of Fort Worth. Block 52 runs north and south for about seven-tenths of a mile and sits between Westridge Avenue and Ridglea Country Club in West Fort Worth, off Camp Bowie Boulevard to the south. Each party to this appeal owns property situated within Block 52.

The original plat for Block 52 contained eight single-family lots. In connection with the filing of the plat, A.C. Luther also filed an instrument entitled "Dedication," which contains restrictions for future construction within Block 52. The restrictions at issue in this appeal pertain to frontage, set-back, and the amount of free space between side property lines:

> *Frontage*—Homes are to be built facing Westridge Avenue and have a presentable front to the golf course running behind . . . .
>
> *Set-back*—No building can be built closer to the adjoining street or streets than the building line shown on the original plat . . . .
>
> *Free Space/Side Yard*—No part of any residence can be erected nearer than twenty feet from the side property line . . . .

2

In 1960, an apartment complex was built within three of the original lots. Instead of single one-family residential structures only, this development caused two original lots and part of a third to have an apartment complex with twenty-eight individual units. A surveyor testified that all of these units violated the side yard and frontage restrictions and that some violated the set-back restrictions. Clay Brants, the real estate agent who formed Westridge, testified that this development violated all three restrictions at issue. Almost twenty years later, the apartments were converted to condominiums and remain there today.

In 1979, following a signed waiver of the restrictions by A.C. Luther, the then-owners of two other lots in Block 52 constructed a garden home development, with fourteen garden homes on the two lots. This development resulted in conversion of two original lots to lots with fourteen homes within eight separate structures and seventeen separate garage outbuildings. Brants testified that the homes were built in violation of all three restrictions. The surveyor also testified that the garden home construction generally violated the frontage restriction, that four of the eight structures violated the set-back restrictions, and that the construction, based on aerial photographs, appeared to violate the side yard restrictions. The garden homes remain there today.

In 1980, the City of Fort Worth, through the City Plan Commission (the Commission), approved a plat adding seven lots to the north end of Block 52. Condominiums and townhouses were constructed on these lots (and still exist today). If the restrictions applied to these additional lots, this development was in violation of the restrictions.[2]

In 1985, two of the replatted lots were again replatted into seven smaller lots, on which more garden homes were built. The surveyor testified that some of this construction violated some of the restrictions.

By 2004, only four detached single-family residences remained on Block 52. The owners of these lots were Ard, Musgrove, Larry Heppe, and Nick Acuff. Ard's home and outbuildings violate the side yard restrictions. Musgrove's home violates the side yard and set-back restrictions.

In late 2004, Ard approached Brants about an idea that Ard had discussed with Heppe several times prior — to either sell his property or develop another garden home project on his lot and Heppe's. Brants and some business partners met with Heppe and Acuff regarding the development idea. Brants then formed Westridge to accomplish this development. Heppe and Acuff sold

---

[2] Appellants urge that any development outside the original eight lots is immaterial to the issues in this case. Without deciding whether this is correct, we have limited our review of the trial court's judgment and findings of fact and conclusions of law to evidence regarding the original eight lots.

4

their lots to Westridge, but Ard refused to do so. Westridge modified its development plans accordingly, tore down the houses on the lots previously owned by Heppe and Acuff, and proceeded to seek approval from the Commission for the garden home development project. The Commission eventually approved Westridge's proposed replatting, and Westridge promptly filed the replat.

In late 2005, Westridge met with Musgrove about the project. Musgrove voiced no objection to the proposed development and asked if Westridge was interested in buying his property for $1 million. Westridge did not purchase Musgrove's lot but proceeded to market lots in the proposed development on the lots previously owned by Heppe and Acuff.

In January 2006, appellants filed this action against Westridge seeking an injunction to prevent the planned development. After a bench trial, the trial court signed an order denying injunctive relief. The trial court later filed findings of fact and conclusions of law, and this appeal ensued.

## II. Standard of Review

We review an order granting or denying injunctive relief for an abuse of discretion.[3] A trial court abuses its discretion when it acts without reference

---

[3] *See Operation Rescue-Nat'l v. Planned Parenthood of Houston & Se. Tex., Inc.*, 975 S.W.2d 546, 560 (Tex. 1998).

to any guiding rules or principles or misapplies the law to established facts.[4] Although we do not review an order granting or denying injunctive relief for legal and factual sufficiency of the evidence, sufficiency of the evidence is a significant factor in determining whether the trial court abused its discretion.[5] If some evidence supports the trial court's order, the trial court does not abuse its discretion to the extent it is called upon to resolve fact questions in deciding whether to grant or deny injunctive relief.[6]

A trial court's construction of a restrictive covenant is reviewed de novo.[7] Covenants restricting the free use of land are not favored by the courts, but when they are confined to a lawful purpose and are clearly worded, they will be enforced.[8] All doubts must be resolved in favor of the free and unrestricted

---

[4] *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

[5] *See Crouch v. Tenneco, Inc.*, 853 S.W.2d 643, 646 (Tex. App.—Waco 1993, writ denied).

[6] *See Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978).

[7] *See Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998).

[8] *See Wilmoth v. Wilcox*, 734 S.W.2d 656, 657 (Tex. 1987); *Davis v. Huey*, 620 S.W.2d 561, 565 (Tex. 1981).

use of the premises, and the restrictive clause must be construed strictly against the party seeking to enforce it.[9]

### III.  Analysis

The parties do not contest that Westridge's proposed development would violate the restrictive covenants.  They join issue only as to whether Westridge established its affirmative defenses against enforcement of the covenants.  If Westridge established any one of its three affirmative defenses—abandonment, change of conditions, and estoppel—then the trial court properly denied injunctive relief for appellants.[10]

### A.    Abandonment and Waiver of Restrictive Covenants—Applicable Law

The Supreme Court of Texas declared over fifty years ago in *Cowling v. Colligan* that a court may refuse to enforce a restrictive covenant "because of the acquiescence of the lot owners in such substantial violations within the restricted area as to amount to an abandonment of the covenant or a waiver of the right to enforce it."[11]  Cases subsequent to *Cowling* illustrate that, in the

---

[9] *See Wilmoth*, 734 S.W.2d at 657; *Settegast v. Foley Bros. Dry Goods Co.*, 114 Tex. 452, 455, 270 S.W. 1014, 1016 (1925).

[10] *Cf. Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006) (noting that "to prevail on a . . . claim[,] a party must overcome any and all affirmative defenses").

[11] *Cowling v. Colligan*, 158 Tex. 458, 461–62, 312 S.W.2d 943, 945 (1958).

context of restrictive covenants, the concepts of abandonment and waiver go hand in hand—a finding that a restriction has been abandoned is essentially the same, and must have the same evidentiary support, as a finding that the right to enforce the covenant has been waived.[12]

To establish the affirmative defense of abandonment or waiver, the defendant "must prove that the violations are so great as to lead the mind of the average man to reasonably conclude that the restriction in question has been abandoned."[13] In determining whether a restrictive covenant has been abandoned or waived, the factors a court should consider include "the number, nature, and severity of the then[-]existing violation[s], any prior acts of enforcement of the restriction, and whether it is still possible to realize to a

---

[12] *See, e.g.*, *Jim Rutherford Invs., Inc. v. Terramar Beach Cmty. Ass'n*, 25 S.W.3d 845, 852 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ("[T]o establish . . . waiver in a deed restriction case, the non-conforming user must prove that the violations then existing are so great as to lead the average man to [reasonably] conclude [that] the restriction in question [has] been abandoned and its enforcement waived."); *Pebble Beach Prop. Owners' Ass'n v. Sherer*, 2 S.W.3d 283, 289–90 (Tex. App.—San Antonio 1999, pet. denied) ("To satisfy [the] burden [for proving waiver], Sherer must prove the violations then existing were so extensive and material as to reasonably lead to the conclusion that the restrictions had been abandoned."); *Traeger v. Lorenz*, 749 S.W.2d 249, 250–51 (Tex. App.—San Antonio 1988, no writ) (holding that party was entitled to single jury question on abandonment and waiver).

[13] *Tanglewood Homes Ass'n, Inc. v. Henke*, 728 S.W.2d 39, 43 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.) (abandonment); *see also Hicks v. Loveless*, 714 S.W.2d 30, 35 (Tex. App.—Dallas 1986, writ ref'd n.r.e.) (stating identical test for establishing waiver).

substantial degree the benefits intended through the covenant."[14]  The failure of property owners to object to trivial violations does not preclude enforcement of the covenant.[15]  On the other hand, an abandonment or waiver finding should be sustained where the party resisting enforcement of the covenant presents proof that the violations then existing were so extensive and material as to reasonably lead to the conclusion that the restrictions had been abandoned or waived.[16]

In analyzing whether there has been an abandonment or waiver of a restrictive covenant, courts do not limit their focus to the actions, inactions, or subjective intent of any one party affected by the restrictions.  Rather, they should consider the equities of the entire situation,[17] including but not limited

---

[14] *Tanglewood*, 728 S.W.2d at 43–44 (abandonment) (internal quotation omitted); *see also Pebble Beach*, 2 S.W.3d at 289–90 (waiver and abandonment); *Hicks*, 714 S.W.2d at 35 (waiver).

[15] *See Sharpstown Civic Ass'n, Inc. v. Pickett*, 679 S.W.2d 956, 958 (Tex. 1984); *Pebble Beach*, 2 S.W.3d at 290; *Hicks*, 714 S.W.2d at 34–36.

[16] *See Pebble Beach*, 2 S.W.3d at 290; *Dempsey v. Apache Shores Prop. Owners Ass'n*, 737 S.W.2d 589, 594 (Tex. App.—Austin 1987, no writ); *Tanglewood*, 728 S.W.2d at 43–44; *Hicks*, 714 S.W.2d at 35.

[17] *See Cowling*, 158 Tex. at 462–63, 312 S.W.2d at 946 (stating that in deciding restrictive covenant case, court's "judgment must arise out of a balancing of equities or of relative hardships"); *Gigowski v. Russell*, 718 S.W.2d 16, 22 (Tex. App.—Tyler 1986, writ ref'd n.r.e.) ("In determining whether it would be inequitable to enforce a restrictive covenant against a particular lot owner, we must weigh the equities of the owner in violation of the

to the nature and severity of past violations relative to the restriction sought to be enforced,[18] the extent to which the person attempting to enforce the restriction relied on the restriction in purchasing the property,[19] and the number of properties subject to the restriction relative to the number of violations.[20]

---

covenant against the equities favoring other lot owners who acquired their property on the strength of the restriction.").

[18] *See Sharpstown Civic Ass'n*, 679 S.W.2d at 958 (enforcing residential-only restriction when prior violation—small office building—was insignificant compared to proposed use—commercial car wash); *Cowling*, 158 Tex. at 462–63, 312 S.W.2d at 946–47 (enforcing residential-only restriction when only past violation was "advent of churches into the subdivision"); *Hicks*, 714 S.W.2d at 34–36 (holding that past violations of residential-only restriction were minor when compared to use of property for machine shop).

[19] *See, e.g.*, *Ski Masters of Tex., LLC v. Heinemeyer*, 269 S.W.3d 662, 672–73 (Tex. App.—San Antonio 2008, no pet.) (enforcing restrictive covenant in part because of evidence that parties seeking to enforce residential-only restriction presented evidence of reliance on restriction when purchasing property); *Simms v. Lakewood Vill. Prop. Owners Ass'n*, 895 S.W.2d 779, 786–87 (Tex. App.—Corpus Christi 1995, no writ) (enforcing restrictive covenants where parties seeking to enforce relied on restrictions in purchasing property).

[20] *See Tanglewood*, 728 S.W.2d at 44 (holding that (1) evidence of fifteen violations of set-back restriction for garages and carports out of fifty-six total properties subject to set-back restriction is sufficient to support jury finding of abandonment of that restriction, but (2) five minor violations of set-back restriction for main residence will not support waiver finding); *see also Jim Rutherford Invs.*, 25 S.W.3d at 852 (holding that evidence of only one violation of set-back restriction will not support abandonment finding); *Pebble Beach*, 2 S.W.3d at 290–91 (holding that evidence of fourteen violations of covenant prohibiting trailers and mobile homes out of approximately 800 lots will not support abandonment finding).

10

**B.    Effect of Nonwaiver Provision on Abandonment and Waiver Defense**

The restrictive covenants contain the following nonwaiver clause:

[F]ailure of [A.C. Luther] or the owner or owners of any other lot or lots [in Block 52] to enforce any of the restrictions or covenants herein set forth at the time of its violation shall in no event be deemed to be a waiver of the right to do so at any time thereafter.

Appellants argue in their second issue that this nonwaiver provision precludes Westridge's abandonment/waiver defense as a matter of law.  Westridge responds that nonwaiver provisions are irrelevant to the issue of whether a restriction has been abandoned and that in any event appellants waived the nonwaiver provision.

**1.    Enforceability of Nonwaiver Provision**

Nonwaiver clauses or provisions are generally enforceable in Texas.[21] Moreover, Texas courts have treated nonwaiver provisions in restrictive covenants as enforceable.

In *TX Far West, Ltd. v. Texas Investments Management, Inc.*, the Austin Court of Appeals considered a restrictive covenant requiring, among other things, payment of annual maintenance fees.[22]  Citing a nonwaiver provision,

---

[21] *See, e.g.*, *A.G.E., Inc. v. Buford*, 105 S.W.3d 667, 676 (Tex. App.—Austin 2003, pet. denied); *Straus v. Kirby Court Corp.*, 909 S.W.2d 105, 108 (Tex. App.—Houston [14th Dist.] 1995, writ denied).

[22] 127 S.W.3d 295, 298–99 (Tex. App.—Austin 2004, no pet.).

11

the Austin court reversed a summary judgment that the covenant had been waived and remanded for further proceedings, holding that the prior owners' acquiescence in alleged violations of the covenant did not establish waiver as a matter of law.[23]

Similarly, in *Simms v. Lakewood Village Property Owners Ass'n*, a party resisted payment of maintenance fees required by a restrictive covenant on the ground that the restrictions had been abandoned.[24] The Corpus Christi Court of Appeals held that some evidence supported the trial court's conclusion that the general scheme and plan for the subdivision had been followed and that, therefore, the restrictions had not been waived or abandoned.[25] The *Simms* court cited a nonwaiver provision in the restrictive covenant, stating that the provision "was included in the covenant to protect [against] any claims that the covenant had been waived or abandoned because of a failure to prosecute prior violations."[26]

---

[23] *Id.* at 306.

[24] 895 S.W.2d at 786–87.

[25] *See id.*

[26] *Id.* at 787.

12

## 2. Waiver of Nonwaiver Provision

The fact that nonwaiver provisions may be enforceable in Texas, however, does not resolve the issue here, which is whether the nonwaiver provision at issue was itself waived. Like other contractual provisions, nonwaiver provisions can be waived.[27] And neither *TX Far West* nor *Simms* holds, as appellants ask this court to hold, that the existence of a nonwaiver provision precludes a finding of abandonment and waiver as a matter of law. Far from declaring that a nonwaiver provision conclusively resolved the issue, the *TX Far West* court held that the existence of the nonwaiver provision raised a fact issue on waiver.[28] And *Simms* suggests that restrictive covenants can be waived, despite the existence of a nonwaiver provision, when there is evidence that violations of the covenants subvert the general scheme or plan.[29]

Neither party cites, and our research has not uncovered, any Texas case that specifically addresses the issue of whether a nonwaiver provision in a

---

[27] *See A.G.E.*, 105 S.W.3d at 676; *Straus*, 909 S.W.2d at 108; *Winslow v. Dillard Dep't Stores, Inc.*, 849 S.W.2d 862, 863–64 (Tex. App.—Texarkana 1993, writ denied).

[28] 127 S.W.3d at 306.

[29] 895 S.W.2d at 786–87. Equally important in *Simms* was the fact that many lot owners had purchased in reliance on the restrictions. *See id.* ("To hold [that the restrictions were waived] would be an injustice to the many lot owners who purchased their property in reliance upon the protection afforded by the covenants and are still relying upon that protection.").

restrictive covenant is waived when the restrictions have been abandoned. We agree, however, with the holding of the Arizona court of appeals in *Burke v. Voicestream Wireless Corp. II*[30] that a "non-waiver provision would be ineffective if a complete abandonment of the entire set of [r]estrictions has occurred."[31] Such an abandonment has occurred, according to the Arizona court, when the violations are so pervasive that they have "destroyed the fundamental character of the neighborhood."[32] To determine whether the trial court erred by holding that the nonwaiver provision has been waived, then, we must examine the record to see if there is evidence of abandonment, that is, of violations so pervasive that the trial court could reasonably have determined that the fundamental character of the neighborhood had been destroyed.

### 3.   Evidence Supporting Trial Court's Abandonment Conclusion

We review the trial court's abandonment conclusion based on three factors:  the number, nature, and severity of the then-existing violations; any

---

[30] 87 P.3d 81 (Ariz. Ct. App. 2004).

[31] *Id.* at 87.

[32] *Id.*; *see also Venture Out at Mesa, Inc. v. Osburn*, 2008 WL 4182858, at *7 (Ariz. Ct. App. 2008) (holding that tenant did not establish waiver of nonwaiver provision when homeowners' association sought to enforce age restriction and there was no evidence that restrictions generally had been abandoned such that fundamental character of development had changed).

prior acts of enforcement of the restriction; and whether it is still possible to realize to a substantial degree the benefits intended through the covenant.[33]

Applying these factors, first, there is evidence of a significant number of substantial violations of the restrictions.[34] Four of the original eight lots contained apartment buildings and garden homes instead of one single-family residence as was contemplated in the original plat in 1946.[35] Westridge presented evidence that most of the structures built on these four lots violated one or more of the restrictions. Specifically, there was evidence that (1) all of the construction on three of the original lots — the apartment buildings — violated the side yard and frontage restrictions and that some of this construction violated the set-back restrictions; (2) construction on two of the original lots — the garden homes — generally violated the frontage restriction, appeared to violate the side yard restriction, and half violated the set-back restrictions;

---

[33] *See Pebble Beach*, 2 S.W.3d at 290–91; *Tanglewood*, 728 S.W.2d at 43–44.

[34] *See Cowling*, 158 Tex. at 462–63, 312 S.W.2d at 945–46; *Tanglewood*, 728 S.W.2d at 43–44.

[35] *See Tanglewood*, 728 S.W.2d at 44 (holding that evidence of violations of set-back restrictions on fifteen out of fifty-six properties will support abandonment finding).

and (3) the homes of both appellants violated the side yard restrictions, and the home of one of the appellants also violated the set-back restrictions.[36]

Moreover, this evidence supports a finding that the fundamental character of the neighborhood has been abandoned.[37] The restrictions at issue are part of a cluster of covenants that include the declaration that "[n]o . . . apartment house . . . and no building of any kind whatsoever shall be erected or maintained thereon except private dwelling houses . . . [denoted] and designed for occupancy by a single family only." The trial court could reasonably have inferred from the evidence, including this covenant, that the restrictions on set-backs, frontages, and side property lines were part of an overall intent to preserve Block 52 as eight lots each with only a single one-family residence. But by 1985, Block 52 had primarily become condominiums, townhouses, and garden homes, undercutting the essential purpose underlying the restrictions and destroying the fundamental character of Block 52 as contemplated by the restrictive covenants generally. This factor weighs heavily in favor of the abandonment conclusion.

---

[36]⬆ *See Pebble Beach*, 2 S.W.3d at 290–91; *Tanglewood*, 728 S.W.2d at 43–44.

[37]⬆ *See Burke*, 87 P.3d at 87; *cf. Simms*, 895 S.W.2d at 786–87 (affirming holding of no abandonment or waiver where there was "evidence that the general scheme and plan of the subdivision has been followed").

Second, appellants presented no evidence of any prior attempts to enforce the restrictions.[38] There was evidence that A.C. Luther waived the restrictions with regard to the 1979 garden home development on two of the original lots, but there is no evidence that any other property owner within the restricted area, including appellants, objected to this waiver or otherwise ever attempted to enforce the restrictions. This factor weighs in favor of the abandonment conclusion.

Third, the trial court found that Westridge's proposed development would have a substantially different effect on appellants than previous violations of the restrictions and that appellants would realize substantial benefits from enforcement of the restrictions. Westridge does not contest these findings. This factor weighs against the abandonment conclusion.

Finally, we note that appellants presented no evidence that they purchased their properties in reliance on the restrictions. To the contrary, appellants did not know the restrictions existed until they began to pursue litigation to prevent Westridge's proposed development. Bearing in mind that courts must balance the equities favoring the lot owner in violation of restrictive covenants against lot owners who acquire their property on the strength of the

---

[38] *See Cowling*, 158 Tex. at 462–63, 312 S.W.2d at 945–46; *Tanglewood*, 728 S.W.2d at 43–44.

restrictions,[39] we conclude that the trial court did not err by holding that the restrictions were abandoned.

Appellants emphasize the trial court's finding that neither of them intentionally waived their right to enforce the restrictions. Appellants' individual intent, however, is relevant to the abandonment analysis only to the extent that they purchased in reliance on the restrictions (which they did not) and that they attempted to previously enforce the restrictions (which they did not). Because we reject appellants' argument that a nonwaiver provision defeats an abandonment defense as a matter of law, and because evidence of substantial violations so pervasive that the fundamental nature and character of the neighborhood has been abandoned is also evidence that a nonwaiver provision has been abandoned, we cannot say that the trial court erred in holding that appellants waived the nonwaiver provision. We overrule appellants' second issue.

## C.     Effect of Findings of "Substantial Benefit" and "Substantially Different Effect"

In their third and fourth issues, appellants argue that the trial court's findings—that Westridge's proposed development will have a "substantially different effect" on appellants' properties than prior violations of the restrictions

---

[39] *See supra* n.17.

18

and will materially affect appellants' enjoyment of their properties—preclude the trial court's abandonment conclusion as a matter of law. But these factors are not, standing alone, dispositive of the issue as a matter of law. The trial court must weigh all the factors and balance all the equities in determining whether there has been an abandonment of the restrictions.[40]

Appellants rely on the Supreme Court of Texas's decision in *Sharpstown* in asserting that an abandonment or waiver finding is erroneous as a matter of law when the proposed use is substantially different in its effect than prior violations. In *Sharpstown*, however, the supreme court held only that a comparatively minor violation of a residential-only restriction—use of a single property as an office building—would not support a holding that the residential-only restriction is abandoned for any proposed future use, including a commercial car wash.[41] The supreme court reasoned that to so hold would mean that use of a residential property to give piano lessons would mean any property owner could subsequently convert his property into a service station, a result the court deemed unreasonable.[42] Importantly, however, the court held that the party seeking to enforce the residential-only restriction did waive that

---

[40] *See supra* nn.12–19.

[41] 679 S.W.2d at 958.

[42] *See id.*

restriction "as to the use of [the property] for the purposes for which it was used [i.e., as an office building] from 1970 until purchased by [the party seeking to avoid the restriction] in November of 1979."[43]  In other words, a restriction can be waived to the extent it is violated, even if a more expansive "waiver" would not be supported by the evidence.

Here, the record discloses evidence not merely of a single violation of the restrictions, like in *Sharpstown*, but of ongoing material violations of the restrictions that fundamentally changed the character of the planned development.  Under these circumstances, the trial court could reasonably have concluded that (1) the proposed development immediately adjacent to appellants' properties would have a substantially different effect than earlier violations farther from appellants' properties and enforcing the restrictions would substantially benefit appellants, but (2) nevertheless the restrictions have been abandoned based on the totality of the circumstances and the balancing of equities.  We overrule appellants' third and fourth issues.

---

[43] *Id.*

## IV. Conclusion

For the foregoing reasons, we affirm the trial court's judgment.[44]


PER CURIAM


PANEL:  CAYCE, C.J.; DAUPHINOT and MCCOY, JJ.

DELIVERED:  April 9, 2009

---

[44] Because of our disposition of the abandonment and waiver issues, we need not reach appellants' other issues regarding changed conditions and estoppel.  *See* Tex. R. App. P. 47.1.